STATE EX REL. BOKAS, RELATOR, v. DISTRICT COURT OF THE COUNTY OF ROOSEVELT, ET. AL., RESPONDENTS.

No. 9410.

Submitted April 6, 1954. Decided May 12, 1954.

270 Pac. (2d) 396.

Bayuk & Lowney, Poplar, Miss Mary E. Hughes, Glendive, Terese Lowney, Poplar, for respondent.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Hubert J. Massman, Asst. Atty. Gen., Mr. William B. McCracken, Co. Atty., Wolf Point, for appellant.

Miss Hughes, Miss Lowney, Mr. Massman and Mr. McCracken argued orally.

MR. JUSTICE BOTTOMLY:

William L. Bokas is an Indian and an enrolled and allotted member of the Sioux Indian tribe. He was born and has resided all his life on the Fort Peck Indian Reservation at Poplar, Roosevelt County, Montana. He has never received a patent in fee of his allotment of land on said reservation.

By information filed in the state district court of Roosevelt County, Bokas is charged with having forged and attempted to pass a $7.50 check at "Don's Store" in Poplar, Montana. He was arrested on this charge, and upon his arraignment, chal-

lenged the jurisdiction of the state court to entertain or try him on the charge. Following a preliminary hearing at which the recited facts were presented, Bokas moved for a dismissal of the information for lack of jurisdiction. By the court's order made March 16, 1954, the motion to dismiss was denied. Thereafter Bokas made application to this court for relief, challenging the jurisdiction of the trial court to further proceed on the information there filed.

The only question involved is: Does the state district court have jurisdiction to try Bokas for the crime of which he is accused? There is no dispute as to the facts.

It is conceded that the city of Poplar and Don's Store are located within the exterior boundaries of the Fort Peck Indian Reservation and that the United States Government has heretofore ceded all of its right, title and interest in and to the real estate upon which Don's Store stands.

The question of jurisdiction was timely raised.

A little history may help clarify the question. The agreement and contract establishing the Fort Peck Indian Reservation between the United States and the Indian tribes was entered into on December 28, 1886, and ratified and approved by Congress May 1, 1888. Under this agreement the Indians ceded vast tracts of land to the United States and in exchange therefor the Indians were to and did retain the lands within the exterior boundaries of the designated area as their Fort Peck Indian Reservation, for their exclusive use and benefit.

In 1885, the Congress had enacted, "That the laws of the United States punishing the crimes of forgery, or of depredations upon the mails of the United States, be, and the same are hereby, extended, to and declared to be in full force in the Indian country." 10 Stat. 700. Thereafter, this section was revised to read, "The general laws of the United States defining and prescribing punishments for forgery and for depredations upon the mails, shall extend to the Indian country." Rev. Stat. sec. 2144, 25 U. S. C. A. Indians, sec. 215. This section was repealed by implication by Congress in 1948 as being covered by

40.

the Congress enacting in 1948 the following statute: "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

"This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively." 62 Stat. 757, Ch. 645, June 25, 1948, Title 18, U. S. C. A. Crimes and Criminal Procedure, sec. 1152.

We have heretofore determined that section 1151, Title 18 U. S. C. A., as amended May 24, 1949, c. 139, sec. 25, 63 Stat. 94, means just what it says and as pertinent here expressly states: "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) *all land* within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of *any patent,* and, including rights-of-way running through the reservation * * *". By the enactment of this section, the Congress chose language carefully designed to aptly define and limit the term "Indian Country" to the area and lands within the limits of the exterior boundaries of a duly and regularly constituted, designated, existing Indian reservation established by the law of the United States which is being supervised and administered by an officer or an employee of our Federal Government for the benefit and in the interests of the general government's ward Indians residing thereon. State v. Pepion, 125 Mont. 13, 230 Pac. (2d) 961; State ex rel. Irvine v. District Court, 125 Mont. 398, 239 Pac. (2d) 272, and cases therein cited.

The Fort Peck Indian Reservation is such an Indian reservation, having been repeatedly recognized as such by Acts

of Congress extending over the years since its creation in 1888 to the present time.

In determining the intent of Congress as to the meaning of "Indian Country" as defined in section 1151, supra, it is significant to note that the only exceptions to said definition are the exceptions in sections 1154 and 1156, all three sections being passed and amended at the same time in 1948 and 1949. Both sections 1154 and 1156 dealt with intoxicants and each in part provides that "The term 'Indian country' as used in this section does not include fee-patented lands * * * or rights-of-way through Indian reservations, and this section does not apply to such lands or rights-of-way in the absence of a treaty or statute extending the Indian liquor laws thereto."

Section 349, 25 U. S. C. A., Indians, 34 Stat. 182, referring to the Indian wards and the wards' allotment of land and the issuing of patents to the allottee, as pertinent here provides: "That until the issuance of fee-simple patents *all allottees* to whom trust patents shall be issued *shall be subject to the exclusive jurisdiction of the United States.*" Emphasis supplied.

We hold that, under the federal laws, the Indian ward, while ▆ residing on and being on and within the exterior boundaries of his Indian reservation, is under the exclusive jurisdiction of his guardian, our Federal Government, in regard to all crimes recognized and made applicable to the Indian country by Congress. For those lesser crimes, not cognizable by Congress, the last paragraph of section 1152 of Title 18, U. S. C. A., supra, applies. This holding is not new, as this court, speaking through Chief Justice Callaway, said in State v. Big Sheep, 75 Mont. 219, 243, Pac. 1067, 1071: "If he is an allottee who has not obtained patent in fee, he is still a ward of the government, although a citizen, and under the provisions of section 4203 [U. S. Comp. Stat., now sec. 349, Title 25, U. S. C. A., supra], *unquestionably is 'subject to the exclusive jurisdiction of the United States.'* * * * So far as acts committed by him within the reservation may be brought in question, it will be noted that the *latter part of that section does not confine jurisdiction to property rights.*

It was evidently enacted pursuant to the government's *guardian* and *ward* policy with respect to the *Indians* who had not yet been *fully emancipated.* * * *

"The United States courts have always asserted jurisdiction over Indians living on and maintaining tribal relations within their reservations, and, whenever the question has been presented, have denied the jurisdiction of the state courts over them. (Citing cases.) * * *

"* * * Probably it would be more exact to say that the United States courts have always asserted federal jurisdiction, and denied state jurisdiction, over Indians who are wards of the government residing within Indian reservations. * * *

"Incidentally, we do not find any pronouncement by the Legislature indicating an attempt to extend the criminal laws of Montana over tribal Indians for acts committed within a reservation." Emphasis supplied.

We are in full accord with that part of the Big Sheep case embraced in the foregoing quotation, from the opinion of Chief Justice Callaway.

This court in State v. Monroe, 83 Mont. 556, 274 Pac. 840, 841, said: "* * * if committed [the crime] by an Indian still under governmental guardianship the jurisdiction would be in the federal court (U. S. Codes, Ann., title 18, chap. 15, sec. 548; State v. Big Sheep, supra; United States v. Pelican, 232 U. S. 442, 34 S. Ct. 396, 58 L. Ed. 676; Apapas v. United States, 233 U. S. 587, 34 S. Ct. 704, 58 L. Ed. 1104), because in such case the Indian is a ward of the United States 'in respect of whom there is devolved upon the federal government "the duty of protection, and with it the power." (United States v. Kagama, 118 U. S., 375, 384, 6 S. Ct. 1109, 30 L. Ed. 228, 231).' United States v. Ramsey, 271 U. S. 467, 46 S. Ct. 559, 70 L. Ed. 1039." See, 42 C. J. S., Indians, sec. 70, pages 775, 776, 777; 27 Am. Jur., secs. 42, 43, 44, 45, Indians, pp. 568, 569, 570.

In United States v. Pelican, 232 U. S. 442, 34 S. Ct. 396, 400, 58 L. Ed. 676, Mr. Justice Hughes, speaking for the court in discussing the meaning and effect of section 349, supra, stated:

"And, at the same time, there was added to the section the explicit proviso: 'That until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States.' We deem it to be clear that Congress had the power thus to continue the guardianship of the government. (Citing cases.)"

The history of the federal legislation, federal administration and judicial adjudication of cases affecting Indians makes it quite clear that Congress has and may assume at any time exclusive jurisdiction of its wards, as the guardian. The exclusive jurisdiction of its wards within the Indian country was asserted by our Congress as late as 1948 and 1949, as illustrated by the federal statutes hereinbefore quoted. Compare State v. Pepion, supra; State ex rel. Irvine v. District Court, supra.

It should always be kept in mind in considering Indian problems, congressional Indian legislation, both criminal and civil, the interpretation of Indian treaties, Indian contracts and all matters dealing with Indian affairs, that the entire policy and emphasis has always been focused upon the protection and treatment of the individual Indian himself, his tribe and their property, and the federal courts have consistently so construed such legislation.

The defendant below, relator here, is still a ward of our Federal Government, and is still under the exclusive jurisdiction of our Federal Government for all acts and crimes defined and made punishable by the laws of Congress, when committed within the exterior boundaries of an Indian reservation, as defined herein.

As has been repeatedly stated by the federal courts, "There can be no divided jurisdiction in regard to Indian wards of the Federal Government."

The state's motion to quash is denied.

The state district court being without jurisdiction to entertain the information filed against the defendant, William L. Bokas, or to try him for the alleged crime, it is ordered that the information be and it is dismissed,—that the bail or undertaking·

44

of defendant be exonerated,—that defendant William L. Bokas be released and discharged from custody and that a writ so directing issue forthwith.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICES FREEBOURN and ANDERSON, concur.

MR. JUSTICE ANGSTMAN: (specially concurring).

I agree with the result reached in the foregoing opinion solely on the ground of stare decisis. I see no substantial difference between this case and that of State ex rel. Irvine v. District Court, 125 Mont. 398, 239 Pac. (2d) 272. Also the cases of State v. Pepion, 125 Mont. 13, 230 Pac. (2d) 961, and State v. McClure, 127 Mont., 534, 268 Pac. (2d) 629, compel the conclusion arrived at in this case. I disagreed with the majority opinion in each of the foregoing cases. My views of the law are set forth in my dissenting opinions therein. But it is now settled by the foregoing cases that if an Indian ward commits a crime at a place which was once a part of an Indian reservation the state courts have no jurisdiction over him, even though the Federal Government has relinquished its title to the land where the crime was committed.

I do not agree however that the case of State v. Big Sheep, 75 Mont. 219, 243 Pac. 1067, 1071, supports the conclusion reached in the foregoing opinion of Mr. Justice Bottomly. The part of the opinion in the Big Sheep case quoted by Mr. Justice Bottomly is subject to the further statement made in the Big Sheep case that "Lands to which the United States has parted with title, and over which it no longer exercises control, even if within the exterior boundaries of the reservation, are not deemed a part of the reservation."

The part of the Big Sheep case that would apply here is that part reading: "If defendant is a ward of the government, and the act was committed by him upon land to which the United States has relinquished title, the state has jurisdiction * * *".

It is my contention that the Big Sheep case has been overruled

by necessary implication by the later cases above cited and on that account I agree with the conclusion reached in the foregoing opinion prepared by Mr. Justice Bottomly.