John BLACKBURN, Appellant
(Defendant below),

v.

STATE of Wyoming, Appellee
(Plaintiff below).

Orlando ANTELOPE, Jr., Appellant
(Defendant below),

v.

STATE of Wyoming, Appellee
(Plaintiff below).

No. 2957.

Supreme Court of Wyoming.

Nov. 22, 1960.

John J. Spriggs, Sr., Lander, and John J. Spriggs, Jr., Washington, D. C., for appellant.

Norman B. Gray, Atty. Gen., and W. M. Haight Deputy Atty. Gen., Cheyenne, for appellee.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Chief Justice BLUME delivered the opinion of the court.

This case purports to be an appeal on behalf of John Blackburn and Orlando Antelope, Jr., from a judgment of conviction against them as hereinafter mentioned. It is doubtful at least that we have any case before us except on behalf of the appeal of John Blackburn in view of the fact the record before us contains no information against Antelope or sentence against him. The only reference to any sentence is by counsel for defendant Blackburn in their notice of appeal. In view of our conclusion herein, the point is not important.

An information was filed against John Blackburn by the County and Prosecuting Attorney of Fremont County, Wyoming, charging that on April 2, 1958, John Blackburn:

"II.

"did wilfully, unlawfully and feloniously, have carnal knowledge of a woman, to-wit: Lena Reyes, forcibly and against her will, and

"III.

"did wilfully and unlawfully violate the personal liberty of another, to-wit: Lena Reyes, by confinement and detention without legal authority and against the will of said Lena Reyes, and

\* \* \* \* \* \*

"V.

"did wilfully, unlawfully and feloniously, perpetrate an assault and battery upon a human being, to-wit: Lena Reyes, with intent to commit a felony, to-wit: Robbery \* \* \*."

Other charges are contained in the information but in view of the fact that the defendant Blackburn was convicted only of the matters above mentioned we need not set out the remaining part of the information. Defendant John Blackburn pleaded not guilty. Apparently an information had been filed against Orlando Antelope, Jr., and C. Anthony Brown. By and through their attorney, E. L. Newton, it was stipulated that the cases against Blackburn, Antelope and C. Anthony Brown might be consolidated. After the court gave instructions to the jury, the latter returned a verdict finding the defendant John Blackburn guilty of the crime of rape as charged in the second count of the information, guilty of the charge of false imprisonment as charged in the third count of the information and guilty of the crime of assault and battery with intent to commit a felony, to wit, robbery, as charged in the fifth count of the information. A like verdict was returned against Antelope. On November 14, 1958, the court sentenced the defendant Blackburn to imprisonment in the penitentiary as follows:

"Upon the count of rape as by law defined, not less than two years nor more than four years;

"As to the count of assault and battery with the intent to commit a felony, to-wit: robbery as by law defined, not less than one year nor more than two years, the terms of confinement to run concurrently,"

John Blackburn by his attorney, E. L. Newton, on November 18, 1958, gave notice that he appealed from the judgment rendered on November 14, 1958. Thereafter E. L. Newton received permission from the court to withdraw from the case as attorney for the defendant Blackburn. Thereafter John J. Spriggs, Sr., and John J. Spriggs, Jr., appeared as attorneys for the defendant and appellant Blackburn. On December 10, 1958, the defendant Blackburn by and through his attorneys filed a motion to vacate, set aside and quash the information, verdict, judgment and sentence. The motion stated that all proceedings were without jurisdiction, void, and of no force or authority in law because: (a) The court was without jurisdiction over defendant and without jurisdiction over the alleged offenses and subject matter; (b) the court was without jurisdiction to arrest, detain, charge, try, convict and sentence defendant for the alleged offenses; (c) the defendant at the time of the alleged offenses was an Arapahoe Indian living upon and under the charge of the Superintendent of the Wind River Indian Reservation in Fremont County, Wyoming, and was at all of said times a ward of the Government of the United States; Lena Reyes, named in said proceedings as complaining witness against whom said alleged offenses were committed, was at all times an Indian woman living on said reservation; (d) the venue of said alleged offenses as charged in the information where said alleged offenses were committed was in Indian country, to wit: "at a point approximately nine miles North of Riverton, Fremont County, Wyoming," and was within the exterior boundaries of the Wind River Indian Reservation in Fremont County, Wyoming, a point within the exclusive jurisdiction of the United States; and (e) the alleged offenses were part of those mentioned in 62 Stat.

827, as amended, 18 U.S.C.A. § 3242, the exclusive jurisdiction of which was in the federal courts of the United States. The court on November 10, 1959, overruled the motion, holding that the crime was not committed within the exterior boundaries of the Wind River Reservation as then existing. Thereupon, on November 13, 1959, a notice of appeal was filed both on behalf of John Blackburn and Orlando Antelope, Jr., from the order of the court dated November 10, 1959.

1. Venue.

Counsel for appellants contend that the venue has not been shown to have been in Fremont County, Wyoming. We might say in the first place that counsel in designating as to what should be contained in the record stated in part as follows: "The evidence of defendant John Blackburn, and the evidence of Orlando Antelope Jr and the evidence of complaining witness Lena Reyes." The certificate of the court reporter states:

"I, Leroy Walker, an official court reporter of the Seventh Judicial District of Wyoming, do hereby certify that the foregoing is a true and accurate transcript of the testimony of the witnesses Lena Reyes, John Blackburn and Orlando Antelope, Jr., and that said transcript contains all of the testimony of the said witnesses and all proceedings which occurred during the course of the testimony of the said witnesses, upon the trial of the hereinbefore-captioned cause."

It will be noted that the certificate does not state that the record contains all the evidence introduced in the trial of the cause. It is stated in 4A C.J.S. Appeal and Error § 1172 that the question involving the sufficiency of the evidence cannot be reviewed unless all, or substantially all, the evidence bearing on the question is in the record. To that effect also are the cases of this court—Cadoma Sheep Co. v. Doughaard, 41 Wyo. 502, 287 P. 436; Mulhern v. Mahs, 41 Wyo. 214, 284 P. 123. It is not improbable that some or many more witnesses testified in the cause who might have established the venue more definitely than it was by the witnesses as hereinbefore mentioned. Aside from that, however, we think there is sufficient evidence contained in the record to indicate that as a matter of fact the alleged crimes took place in Fremont County, Wyoming. As shown by the evidence, they took place on or near a highway a comparatively short distance north or northeast of Riverton, Wyoming, in the area known as "Riverton Project." We take judicial notice of the fact that Riverton is located in Fremont County, Wyoming. We have before us a map of this state issued by the United States Department of the Interior. We take judicial notice of this map. Robinson Mercantile Co. v. Davis, 26 Wyo. 484, 187 P. 931; Bonner v. Jackson, 158 Ark. 526, 251 S.W. 1; 31 C.J.S. Evidence § 32, p. 576. The map shows that Riverton and the area for many miles north of Riverton is not contained in the Wind River or Shoshone Indian Reservation as now existing but is contained in Fremont County, Wyoming. So the contention above mentioned must be overruled.

2. Indian Country.

The complaining witness and the two defendants herein are Indians and it is the contention of appellants herein that because they are Indians and because, as they contend, the crimes took place in Indian country the court had no jurisdiction in this case. 62 Stat. 758, as amended, 18 U.S.C.A. § 1153, relating to crimes and criminal procedure, provides as follows:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

"As used in this section, the offense of rape shall be defined in accordance with the laws of the State in which the offense was committed, and any Indian who commits the offense of rape upon any female Indian within the Indian country, shall be imprisoned at the discretion of the court.

"As used in this section, the offense of burglary shall be defined and punished in accordance with the laws of the State in which such offense was committed."

The crimes involved in the case at bar fall within the provisions of the foregoing section if committed within Indian country. By 62 Stat. 757, as amended, 18 U.S.C.A. § 1151, Congress defined "Indian country" as follows:

" * * * (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

In order to determine as to whether or not the foregoing section applies herein, we must examine the various Acts of Congress which relate to the territory herein question.

As shown by 33 Stat. 1016 (1905), one James McLaughlin, United States Indian inspector, made an agreement with the Shoshone and Arapahoe tribes of Indians belonging to the Shoshone or Wind River Reservation in the State of Wyoming in which it was provided:

"Article I. The said Indians belonging on the Shoshone or Wind Riv-er Reservation, Wyoming, for the consideration hereinafter named, do hereby cede, grant, and relinquish to the United States, all right, title, and interest which they may have to all the lands embraced within the said reservation, except the lands within and bounded by the following described lines: * * *."

Then follows a description of land not ceded which is the land still within the reservation above mentioned as shown on the map before us. The land actually ceded is the land now shown to be part of Fremont County but not within the reservation. The Act further provided that if an Indian had selected a tract within the ceded portion he should have the right to have the title confirmed in him. This provision has no application herein insofar as the record shows. Article II of the Act provided:

"In consideration of the lands ceded, granted, relinquished, and conveyed by Article I of this agreement, the United States stipulates and agrees to dispose of the same as hereinafter provided under the provisions of the homestead, town-site, coal, and mineral land laws, or by sale for cash * * *."

The agreement was approved by an Act of Congress on March 3, 1905.

By an Act of August 15, 1953, as shown by 67 Stat. 592, Congress enacted a statute providing that the sum of $1,009,500 should be credited and expended for the benefit of the Shoshone and Arapahoe Indians of the said Indian reservation of Wyoming and stated that this sum "shall be deemed to constitute full, complete, and final compensation, except as provided in section 5 of this Act, for terminating and extinguishing all of the right, title, estate, and interest, including minerals, gas and oil, of said Indian tribes and their members of, in and to the lands, interests in lands, and any and all past and future damages arising out of the cession to the United States, pursuant to the Act of March 3, 1905 (33 Stat. 1016)."

Section 5 of the Act (67 Stat. 613) provided:

"* * * the United States shall deposit in the Treasury of the United States to the credit of said tribes * * * 90 per centum of the gross receipts of the United States, as they are received from time to time, from all leases, bonuses, royalties, or other proceeds derived under the mining and mineral-leasing laws of the United States from any and all lands in which all rights and interests of the tribes are terminated and extinguished by the terms and conditions of section 1 of this Act * * *."

The Act further provided that ten percent of the gross receipts should be credited to miscellaneous receipts. The Act was amended on August 27, 1958 (72 Stat. 935, 25 U.S.C.A. § 611 note), by the provision that the ten percent above mentioned should be transferred to the credit of the tribes. It also stated in part:

"* * * all of the right, title, and interest of the United States in all minerals, including oil and gas, the Indian title, to which was extinguished by the Act of August 15, 1953 * * * is hereby declared to be held by the United States in trust for the Shoshone and Arapahoe Tribes * * *."

The trial court, considering the Acts of Congress, stated as follows:

"That the crimes for which the defendants were convicted in said causes were committed within the exterior boundaries of the Wind River Indian Reservation as originally established by the treaty between the United States and the eastern band of Shoshone Indians, dated July 3, 1868; and further that said crimes were committed upon that portion of said reservation, all right, title and interest to which was ceded, granted and relinquished by said Indians to the United States by agreement dated April 21, 1904; and further that said crimes were committed within that area of the ceded portion of said reservation described and set forth in the Act of Congress of August 15, 1953, 67 Stat. 592 (U.S.C.A.—Title 25, Sec. 611) which provided for the payment of $1,009,500 by the United States to the Shoshone and Arapahoe Tribes of Indians in full and complete and final compensation for terminating and extinguishing all of the right, title, estate and interest of said Indian tribes in and to the particular lands therein described.

"The Court therefore concludes that the place where said crimes were committed did not constitute a part of the Wind River Indian reservation and did not constitute Indian Country as defined by Title 18, Sec. 1151 U.S.C.A., which limits the exclusive jurisdiction of the United States over crimes of the nature herein committed on lands within the limits of the reservation which *remain under the jurisdiction of the United States*. When the Indian title to these lands was fully and finally extinguished by the Act of August 15, 1953, aforesaid, jurisdiction, civil and criminal, over these lands passed from the United States to the State of Wyoming in all particulars, the same as any other lands within the public domain of the State of Wyoming."

If the contention of counsel for appellants were correct, then the Town of Riverton, with nearly 7,000 population, close to the Indian reservation, and where many Indians congregate, would still be Indian country, which from the standpoint of law enforcement would be unfortunate. This, we think, may be considered in order to arrive at the intent of Congress. Counsel for appellants argue that criminal statutes must be construed strictly and that Indians are men of a self-governing power. That may be conceded but has no controlling effect herein. Counsel cite us to Application of Denetclaw, 83 Ariz. 299, 320 P.2d 697; State v. Begay, 63 N.M. 409, 320 P.

2d 1017; In re Carmen's Petition, D.C.Cal., 165 F.Supp. 942, affirmed Dickson v. Carmen, 9 Cir., 270 F.2d 809. The Arizona and New Mexico cases relate to offenses committed on highways within existing Indian reservations. It was held that the state courts did not have jurisdiction in view of § 1151 supra. The cases do not apply in this case because the crimes herein involved were not committed in an Indian reservation, and we think that § 1151 supra applies to an existing Indian reservation and not to what it may have been in the past. The case of In re Carmen's Petition, supra, holds that where the defendant was an Indian by blood and the locus of murder was on an Indian allotment, title to which was still held in trust, the state court lacked jurisdiction to try the defendant for the crime committed. Similar in effect is the case of State ex rel. Bokas v. District Court of Fifteenth Judicial District, in and for Roosevelt County, 128 Mont. 37, 270 P.2d 396. These cases do not apply because the locus of the crimes in question here was not on an allotment of land to an Indian as contemplated by § 1151 supra.

 It is stated in 42 C.J.S. Indians § 67, p. 775, as follows:

" * * * In general the criterion to determine whether a particular place has ceased to be Indian country is whether the Indian title to the land has or has not been extinguished. * *"

See also 27 Am.Jur. Indians § 45. Counsel for appellants say that the title to the territory here involved has not been entirely extinguished. They refer particularly to the Act of August 27, 1958, and say that the United States Government in disposing of the land acted merely as agents for the Indians. We think counsel are in error in their conclusions. Construing the Acts of Congress together, we think, as the trial court held, that the title of the Indians to the lands in the territory here involved has been extinguished and that the only right reserved to the Indians is in the money or proceeds received by the United States

from the sale or lease of any rights in the land. The case of Application of De Marrias, 77 S.D. 294, 91 N.W.2d 480, presents a similar state of facts. The court, among other things, said at 91 N.W.2d 482, 483:

"On December 12, 1889 an 'Agreement' was entered into between the United States Government and the Sisseton and Wahpeton bands of the Dakota or Sioux Indians whereby the Indians ' * * * hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said bands of Indians as aforesaid remaining after the allotments and additional allotments provided for in article four of this agreement shall have been made.' 26 United States Statutes at Large, p. 1035. It is provided in the Act of Congress ratifying the Agreement of 1889: 'That the lands by said agreement ceded, sold, relinquished, and conveyed to the United States shall immediately, * * * be subject only to entry and settlement under the homestead and townsite laws of the United States, excepting the sixteenth and thirty-sixth sections of said lands, which shall be reserved for common school purposes, *and be subject to the laws of the State wherein located:* * * *.' Section 30, Chapter 543, 1891 (26 United States Statutes at Large, p. 1039). * * *

"It is readily apparent therefrom that the City of Sisseton is not situated on 'land within the limits of any reservation'. Consequently it is not within the purview of the term 'Indian country' as defined and used in Sections 1151, 1152, and 1153 of Title 18 U.S.C.A."

The foregoing italicized words are not contained in the Congressional Act of March 3, 1905, but we think that the intent is not different. See also Tooisgah v. United

States, 10 Cir., 186 F.2d 93. The instant contentions of appellants are overruled.

3. Sufficiency of Evidence.

Counsel for appellants allege in their brief that there was a lack of sufficient evidence to sustain the judgment and that the evidence of the prosecuting witness was not clear or convincing as required in rape cases. As we have heretofore pointed out, the record does not contain all of the evidence, so that counsel are not entitled to have the foregoing contention reviewed. But aside from that, we may say that the jury, even under only the testimony of the complaining witness, had a right to find that the defendants were guilty of the crimes charged. Three men, namely, the two defendants herein and one C. Anthony Brown, participated in the crimes in question here and all were equally guilty. It would subserve no good purpose to set out the testimony of Mrs. Reyes in detail. Her testimony shows, among other things, that they forced her into an automobile in Riverton against her will and that the defendant Blackburn hit her numerous times, slapped her mouth and, when she protested, told her "Shut up, you Shoshone." Anthony Brown was the driver and they traveled north or northeast from Riverton and when they were out of town stopped along or close to the highway. They took off her clothes. Complaining witness objected and Blackburn hit her again and she got bruises all over her back. Each of the three men raped her against her will while the other two held her. She had $60 in her purse and one or more of them took the money. She was in bed six weeks, recovering from her injuries. The credibility of the complaining witness was for the jury to determine. We think the contention herein made should be and is overruled.

Some other points are mentioned in the statement of points relied on for appeal but they are not argued so it is not necessary to consider them.

The judgment of the trial court should be and is affirmed.

Affirmed.